IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


| | | |
|---|---|---|
| TAHIRAH BEAVER, | ) | CASE NO. 4:16-cv-02883 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Tahirah Lee Beaver ("Plaintiff" or "Beaver") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

## I.  Procedural History

On January 30, 2013, Beaver protectively filed applications for DIB and SSI.[1]  Tr. 23, 173-179, 180-185, 195.  She alleged a disability onset date of March 1, 2009 (Tr. 23, 173, 180,

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 10/16/2017).

195), and alleged disability due to mental health issues, sleep disorder, depression, anxiety, schizophrenia, bipolar disorder, IEP in school and did not graduate, arthritis (Tr. 60, 71, 85, 99, 115, 123, 199).  After initial denial by the state agency (Tr.  115-120) and denial upon reconsideration (Tr. 123-127), Beaver requested a hearing (Tr. 128-129).  A hearing was held before Administrative Law Judge Thomas Ciccolini ("ALJ") on November 9, 2015.  Tr. 38-59.

On November 20, 2015, the ALJ issued an unfavorable decision (Tr. 20-37), finding that Beaver had not been under a disability within the meaning of the Social Security Act from March 1, 2009, through the date of the decision (Tr. 23, 31).  Beaver requested review of the ALJ's decision by the Appeals Council. Tr. 15-19.  On October 14, 2016, the Appeals Council denied Beaver's request for review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-6.

## II. Evidence

### A.     Personal, educational, and vocational evidence

Beaver was born in 1986.  Tr. 30, 173.   She was 29 years of age at the time of the administrative hearing.  Tr. 42.  At the time of the hearing, Beaver was living with her four minor children in an apartment.  Tr. 42-43, 54.  She had lived with her father in the past but he asked her to move.  Tr. 54.  Beaver attended school until about the 11th grade.  Tr. 42.   She last worked full time in 2008.  Tr. 46.

### B.     Medical evidence[2]

#### 1.     Treatment records

---

[2] Beaver contends she is disabled based on her mental impairments and does not challenge the ALJ's findings regarding her physical RFC.  Doc. 12, p. 4.  Accordingly, the evidence summarized herein relates primarily to Beaver's mental impairments.

Beaver received mental health treatment primarily at Valley Counseling Services (Tr. 260-284) and Comprehensive Behavioral Health Associates (Tr. 393-398, 428, 468-476, 503-518).[3]

On May 17, 2012, Beaver saw Amy Bretfelian, LPC, at Valley Counseling Services for an Adult Diagnostic Assessment. Tr. 263-278. Beaver explained that she was having the same problems that she had in the past. Tr. 263. She indicated that she was feeling really confused; she did not want to go anywhere or be around anyone; she was feeling anxious, even while at home; she was worrying a lot; she was having a hard time remembering things, e.g., she would start to do something and then forget what she was doing; she had been feeling depressed for a long time; she reported experiencing some type of hallucinations but did not want to provide more detail about it; she had been abused in the past – sexually, physically and emotionally; and she reported some suicidal thoughts but explained that she had no plan or intent. Tr. 263, 271-272, 275-276.

Beaver was living with her dad and two daughters. Tr. 264. She reported having a "really good" relationship with her daughters, stating she tried to be as fun as possible and would try to stay away if things got too difficult. Tr. 264, 275. Beaver was not in a relationship with the father of her children. Tr. 264. However, he was supportive and helped her out a lot. Tr. 264. Beaver had two sisters and one brother. Tr. 264. She talked to her sisters once or twice a week. Tr. 264. She did not talk with her brother. Tr. 264. Beaver reported that she had to stop working in 2009 because she had problems focusing and severe anxiety. Tr. 266. Beaver

---

[3] Beaver's mental health issues and treatment were noted and/or discussed in treatment records from Comprehensive Care for Women of the Mahoning Valley, Inc., where she received OBGYN services. *See e.g.*, Tr. 432, 434, 440, 447, 463, 465-466.

reported a psychiatric hospitalization in 2007 when she was experiencing a lot of abuse and was suicidal. Tr. 268.

Ms. Bretfelian diagnosed posttraumatic stress disorder (chronic); major depressive disorder, recurrent, severe without psychotic features; and alcohol dependence (early partial remission). Tr. 276. Ms. Bretfelian assigned a GAF score of 38.[4] Tr. 277. Ms. Bretfelian recommended counseling and medication management services. Tr. 277.

Following Ms. Bretfelian's assessment, on May 24, 2012, Beaver saw Lori Funkhouser, NP, at Valley Counseling Services for an initial psychiatric evaluation. Tr. 279-284. Beaver complained of hearing a single male voice that was saying "negative commanding things like telling her to kill herself[.]" Tr. 279. Beaver had no current suicidal thoughts or plan to hurt herself. Tr. 279. She reported seeing images of bright lights, clouds, and shadows of images about 1-2 times each week. Tr. 279. She was sleeping about 10 hours each night but waking about every 2 hours with nightmares. Tr. 279. Beaver reported some anxiety and indicated she had limited social contacts. Tr. 279. She stated people always viewed her as different and she was always a loner. Tr. 279. Ms. Funkhouser observed that Beaver had a flat affect, she was restless, and she had a depressed mood. Tr. 283. Beaver's insight/judgment were noted to be fair. Tr. 283. Ms. Funkhouser diagnosed major depressive disorder, recurrent, severe, with

---

[4] As set forth in the DSM-IV, GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses. *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 31 and 40 indicates "some impairment in reality testing or communication (e.g., speech at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." *Id.* With the publication of the DSM-5 in 2013, the GAF was not included in the DSM-5. *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fifth Edition, Arlington, VA, American Psychiatric Association, 2013 ("DSM-5"), at 16.

4

psychotic features (chronic) and posttraumatic stress disorder (chronic).  Tr. 283.  She assigned a

GAF score of 38.  Tr. 284.

Dr. Kosteswara Kaza, M.D., of Comprehensive Behavioral Health Associates first saw

Beaver on December 3, 2012.  Tr. 394.  Beaver continued to receive treatment at Comprehensive

Behavioral Health Associates, including treatment by Dr. Kaza, during 2013 and 2014.  Tr. 394,

428, 468-472.  Beaver was seen at Comprehensive Behavioral Health Associates on March 5,

2014.[5]  Tr. 469, 470, 473-476.  Beaver was five months pregnant.  Tr. 473.  Beaver was

continuing to report that she was hearing a male voice telling her to hurt herself and others.  Tr.

473.  Beaver was having mood swings.  Tr. 473.  She was sleeping okay.  Tr. 473.  She had poor

eye contact.  Tr. 473.  Diagnoses were major depressive disorder, recurrent, severe with

psychotic features and schizoaffective disorder.  Tr. 475.  Since Beaver was pregnant, no

medication was prescribed.  Tr. 470, 476.  It was noted that Beaver had refused counseling.  Tr.

476.  Beaver was advised to follow up with Dr. Kaza on a monthly basis and she was encouraged

to attend counseling.  Tr. 476.  Beaver had her twin babies on June 18, 2014.[6]  Tr. 486.

### 2.    Medical statements and/or opinion evidence

### a.    Treating sources

*Dr. Kaza – April 2013*

---

[5] It is unclear who signed the March 5, 2014, treatment note.  Tr. 476.

[6] Beaver saw various medical providers at Comprehensive Behavioral Health Associates in 2015.  Tr. 503-518.
These records were not before the ALJ when he issued his decision; they were submitted as part of the Appeals
Council level review.  Tr. 2, 4-5.  The Sixth Circuit has repeatedly held that where, as here, the Appeals Council
denies review and the ALJ's decision becomes the Commissioner's decision, the court's review is limited to the
evidence presented to the ALJ.  *See Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001); *Cline v. Commissioner,* 96
F.3d 146,148 (6th Cir. 1996); *Cotton v. Sullivan,* 2 F.3d 692, 696 (6th Cir. 1993); *Casey v. Secretary of Health &
Human Servs.,* 987 F.2d 1230, 1233 (6th Cir. 1993); see also *Osburn v. Apfel,* No. 98-1784, 1999 WL 503528, at *4
(6th Cir. July 9, 1999) ("Since we may only review the evidence that was available to the ALJ to determine whether
substantial evidence supported [his] decision, we cannot consider evidence newly submitted on appeal after a
hearing before the ALJ.").  Accordingly, the treatment records from 2015 are not summarized herein.

In April 2013, Dr. Kaza completed a form regarding Beaver's mental impairments.  Tr. 394-395.  Dr. Kaza's diagnoses were schizoaffective disorder and depression.  Tr. 396.  Dr. Kaza reported that Beaver complained of hearing voices and poor concentration; she had restricted daily activities, e.g., her conditions affected her ability to take care of cooking, cleaning and laundry; she stayed at home; she had no friends and no social life; and she felt anxious every day.  Tr. 395.  Dr. Kaza noted that Beaver's symptoms had persisted since she was 9 or 10 years old.  Tr. 395.  Dr. Kaza indicated that Beaver had responded poorly to treatment, noting that Beaver's mother had not believed in medication.  Tr.  395.  Dr. Kaza reported that Beaver was compliant with her medication.  Tr. 396.  Dr. Kaza rated Beaver's ability to tolerate stress – both routine daily stressors and work-place stressors – as poor.  Tr. 396.  Dr. Kaza felt that Beaver would not be capable of managing any benefits that might be due her.  Tr. 396.

### Dr. Kaza – January 2014

On January 22, 2014, Dr. Kaza provided a letter which indicated that Beaver was under Dr. Kaza's care at Comprehensive Behavioral Health Associates; Beaver was compliant with all her appointments; and her then current diagnosis was bipolar disorder, NOS.  Tr. 428.

### Ms. Root & Dr. Kaza – April 2015

On April 23, 2015, Ms. Root and Dr. Kaza co-signed a Medical Source Statement: Patient's Mental Capacity form wherein they rated Beaver's ability to perform 22 basic mental activities of work on a sustained basis.  Tr. 499-500.  The ratings were noted in a check-box style format.  Tr. 499-500.  The rating choices were: (1) constant, meaning ability to perform activity is unlimited; (2) frequent, meaning ability to perform activity exists for up to 2/3 of a workday; (3) occasional, meaning ability to perform activity exists for up to 1/3 of the workday; and (4)

rare, meaning activity cannot be performed for any appreciable time.  Tr. 499.  They indicated that Beaver had been under the care of their practice or facility for 2 years.  Tr. 500.

Ms. Root and Dr. Kaza indicated that Beaver had the ability to constantly perform the following 6 activities – (1) maintain regular attendance and be punctual within customary tolerances, (2) deal with the public, (3) deal with work stress, (4) understand, remember and carry out complex job instructions, (5) understand, remember and carry out detailed, but not complex job instructions, and (6) socialize.  Tr. 499-500.  They indicated that Beaver had the ability to frequently perform the following 13 activities – (1) follow work rules, (2) maintain attention and concentration for extended periods of 2 hour segments, (3) respond appropriately to changes in routine settings, (4) relate to coworkers, (5) interact with supervisors, (6) function independently without redirection, (7) work in coordination with or proximity to others without being distracted, (8) work in coordination with or proximity to others without being distracting, (9) complete a normal workday and workweek without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, (10) maintain appearance, (11) behave in an emotionally stable manner, (12) relate predictably in social situations, and (13) leave home on her own.  Tr. 499-500.  They indicated that Beaver had the ability to occasionally perform the following 2 activities – (1) understand, remember and carry out simple job instructions, and (2) manage funds/schedules.  Tr. 500.  Although included in the list of activities to be rated, Ms. Root and Dr. Kaza did not indicate a rating for Beaver's ability to use judgment.  Tr. 499.

Following the check-box portion of the form, Ms. Root and Dr. Kaza explained in narrative form that Beaver needed a case manager or family member to attend routine appointments; she had intrusive hallucinations; and she had severe anxiety, bordering on

paranoia, when around unfamiliar people and places.  Tr. 500.  They noted that Beaver's symptoms persisted despite heavy doses of medication.  Tr. 500.

### *Dr. Manudhane – October 2015*

On October 26, 2015, Dr. Pradeep Manudhane, M.D., of Comprehensive Behavioral Health Associates, completed the same Medical Source Statement: Patient's Mental Capacity form that Ms. Root and Dr. Kaza completed.  Tr. 501-502; Doc. 12, p. 6.  Dr. Manudhane indicated that Beaver had been under the care of his practice or facility for 2 years.  Tr. 502.

Dr. Manudhane indicated that Beaver had the ability to occasionally perform the following 12 activities – (1) follow work rules, (2) use judgment, (3) maintain attention and concentration for extended periods of 2 hour segments, (4) respond appropriately to changes in routine settings, (5) relate to coworkers, (6) interact with supervisors, (7) function independently without redirection, (8) complete a normal workday and workweek without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, (9) understand, remember and carry out simple job instructions, (10) maintain appearance, (11) behave in an emotionally stable manner, and (12) manage funds/schedules.  Tr. 501-502.  Dr. Manudhane indicated that Beaver had the ability to rarely perform the following 10 activities – (1) maintain regular attendance and be punctual within customary tolerances, (2) deal with the public, (3) work in coordination with or proximity to others without being distracted, (4) work in coordination with or proximity to others without being distracting, (5) deal with work stress, (6) understand, remember and carry out complex job instructions, (7) understand, remember and carry out detailed, but not complex job instructions, (8) socialize, (9) relate predictably in social situations, and (10) leave home on her own.  Tr. 502.

Following the check-box rating, similar to the explanation provided by Ms. Root and Dr. Kaza in the form they completed on April 23, 2015, Dr. Manudhane explained in narrative form that Beaver needed a case manager or family member to attend routine appointments; she had intrusive auditory hallucinations; and she had severe anxiety and paranoia when around other people and when in unfamiliar places.  Tr. 502.  Unlike Ms. Root and Dr. Kaza, Dr. Manudhane did not include any information regarding the persistence of Beaver's symptoms despite use of medication.  Tr. 502.

### b.    Consultative examiner

On April 24, 2014, Beaver saw Jennifer Haaga, Psy.D., for a psychological consultative evaluation.  Tr. 478-485.  Beaver reported some history of interpersonal problems with supervisors and coworkers; she reported depressive symptoms and hallucinations; and she reported a history of sexual abuse, indicating she continued to have some difficulties managing symptoms related to the abuse.  Tr. 483.  Dr. Haaga noted that Beaver was not able to provide many details or time frames for her symptoms and that further history would be beneficial.  Tr. 483.  Dr. Haaga found that Beaver appeared to be of low average intelligence.  Tr. 483.  Dr. Haaga diagnosed major depressive disorder, recurrent, with anxious distress, severe; unspecified schizophrenia spectrum and other psychotic disorder; and unspecified trauma and stress related disorder.  Tr. 482.  Dr. Haaga noted that information provided suggested that Beaver had a history of substance abuse and that Beaver was reporting difficulties with remembering to perform tasks that she needed to do.  Tr. 483.  Thus, Dr. Haaga indicated that it would likely be beneficial for Beaver to have assistance with managing her personal funds.  Tr. 483.

With respect to Beaver's functional abilities, Dr. Haaga opined as follows:

9

**Functional Assessment**

**Describe the claimant's abilities and limitations in understanding, remembering, and carrying out instructions.**

She described some difficulties with memory and demonstrated some difficulties with memory during the current evaluation.  She is capable of comprehending and completing simple routine tasks; however, when tasks become more complex, she may experience difficulties with understanding, remembering and following instructions.   She stated she need reminders to do day to day tasks.

**Describe the claimant's abilities and limitations in maintaining attention and concentration, and in maintaining persistence and pace, to perform simple tasks and to perform multi-step tasks.**

She recalled four digits forward and three digits backward on the digit span task. However, her symptoms of depression will likely cause difficulties in this area or will exacerbate those difficulties that she does have.  This will make many tasks somewhat more difficult. Specifically, when the demands become too great, Ms. Beaver will have some difficulty with attention and concentration.  Ms. Beaver's speech and movements were slowed and she would likely have difficulties keeping up in a work environment.  She stated that she has little interest in tasks or activities.

**Describe the claimant's abilities and limitations in responding appropriately to supervision and to coworkers in a work setting.**

Ms. Beaver's interaction with this examiner during the current evaluation was adequate, and she described that she has maintained distant relationships with family.  She has a history of some interpersonal problems with supervisors and coworkers.  Ms. Beaver was difficult to relate to with flat affect and this would likely be problematic in a work situation.

**Describe the claimant's abilities and limitations to responding appropriately to work pressures in a work setting.**

Ms. Beaver takes psychiatric prescription medication to help manage symptoms but continues to experience difficulties.  She has poor relationships with family and friends.  These relationships may create a lack of a social support system which may negatively influence her ability to withstand stress and pressures of work activities. Ms. Beaver stated that stressors in her environment have led her to have increased symptoms.  She reported a history of suicide attempts and reported current ideation.

Tr. 483-484 (alterations in original).

### c.    State agency reviewers

_Patricia Semmelman, Ph.D._

On January 14, 2014, state agency reviewing psychologist Patricia Semmelman, Ph.D., completed a Psychiatric Review Technique ("PRT") (Tr. 64-65) and Mental RFC Assessment (Tr. 66-68).  In the PRT, Dr. Semmelman found that Beaver had mild restrictions of activities of daily living, moderate difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation, each of an extended duration.  Tr. 65.

In the Mental RFC Assessment, Dr. Semmelman opined that Beaver had no significant understanding and memory limitations, explaining that there were no cognitive issues noted in the overall medical evidence of record and no cognitive issues were noted when Beaver was interviewed at her home.  Tr. 66-67.  Dr. Semmelman opined that Beaver was generally not significantly limited in the area of sustained concentration and persistence but she was moderately limited in her ability to work in coordination with or in proximity to others without being distracted by them and in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  Tr. 67.  Dr. Semmelman further explained Beaver's sustained concentration and persistence limitations, indicating that Beaver was capable of routine tasks.  Tr. 67.   With respect to social limitations, Dr. Semmelman opined that Beaver was moderately limited in her ability to interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  Tr. 67-68.  Dr. Semmelman further explained Beaver's social limitations, stating that Beaver was limited to

superficial interactions.  Tr. 68.  With respect to adaptation limitations, Dr. Semmelman opined that Beaver was moderately limited in her ability to respond appropriately to changes in the work setting.  Tr. 68.  Dr. Semmelman explained further that Beaver was able to work in a static, low-stress environment.  Tr. 68.

### *Karla Voyten, Ph.D.*

Upon reconsideration, on May 21, 2014, state agency reviewing psychologist Karla Voyten, Ph.D., completed a PRT (Tr. 92-93) and a Mental RFC Assessment (Tr. 94-96).  In the PRT, Dr. Voyten found that Beaver had mild restrictions of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation, each of an extended duration.  Tr. 92.

In the Mental RFC Assessment, with respect to understanding and memory limitations, Dr. Voyten opined that Beaver was moderately limited in her ability to understand and remember detailed instructions.  Tr. 94.  Dr. Voyten explained further that there were no cognitive issues noted in the overall medical evidence of record.  Tr. 94.  She also explained that Beaver's depressive symptoms would likely cause limitations but found that Beaver was capable of completing simple, routine instructions.  Tr. 94.  In the area of sustained concentration and persistence, Dr. Voyten opined that Beaver was moderately limited in her ability to carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or in proximity to others without being distracted by them; and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  Tr. 94-95.  Dr. Voyten further explained Beaver's sustained concentration and

persistence limitations, indicating that Beaver was capable of simple, routine tasks.  Tr. 95.

With respect to social limitations, Dr. Voyten opined that Beaver was moderately limited in her

ability to interact appropriately with the general public; accept instructions and respond

appropriately to criticism from supervisors; and get along with coworkers or peers without

distracting them or exhibiting behavioral extremes.  Tr. 95.  Dr. Voyten further explained

Beaver's social limitations, stating that Beaver was limited to superficial infrequent interactions.

Tr. 95.  With respect to adaptation limitations, Dr. Voyten opined that Beaver was moderately

limited in her ability to respond appropriately to changes in the work setting.  Tr. 95-96.  Dr.

Voyten explained further that Beaver was able to work in a static, low-stress environment.  Tr.

96.

## C.      Hearing testimony

### 1.      Plaintiff's testimony

Beaver testified and was represented at the hearing.  Tr. 42-55.

With respect to her mental impairments, Beaver indicated that she had mental impairment

problems "[p]retty much all [her] life, ever since [she] was younger."  Tr. 48.  She hears voices.

Tr. 47.  She also has a difficult time sleeping.  Tr. 50.  Beaver has had thoughts of hurting

herself.  Tr. 50.  Her medical providers have advised her to go the hospital if she starts feeling

like she wants to hurt herself.  Tr. 50.

Beaver sees a physician about once each month for mental health treatment.  Tr. 47-48.

Her doctor is Dr. Kaza.  Tr. 47.  At one time, she had a counselor.  Tr. 48.  She stopped seeing

her counselor because it "was too much to do."  Tr.  48.  She had a male counselor and did not

feel comfortable.  Tr. 48.  She then switched to a female counselor.  Tr. 48.  The appointments

got messed up and she just never rescheduled with the counselor.  Tr. 48.   Through the mental

health center, Beaver has a case manager that she had been working with for a little over two years.  Tr. 48-49.  Beaver's case manager provides rides, helps with paperwork, and provides reminders about appointments.  Tr. 49.  Beaver talks with her case manager on the telephone and she also sees her in person.  Tr. 49.  Beaver has side effects from her medication, including dry mouth, constipation, speckles on her eyes, and tiredness.  Tr. 51.  Beaver indicated that she had been admitted to a psychiatric facility more than two or three years earlier.  Tr. 52-53.

Beaver indicated she does not drive because it is hard for her to pay attention to cars and her surroundings.  43-44.  She does use public transportation.  Tr. 44.  Beaver does not have a computer but she does have a cell phone which she sends text messages on.  Tr. 45-46.

Beaver receives help caring for her children and taking care of things at home.  Tr. 49-50.  She stated that her children's dad, her dad, her mom, and her niece and nephew all help her out.  Tr. 50.  Beaver stated that someone usually comes every day to help her out.  Tr. 50.

With respect to her day-to-day activities, Beaver explained that her children's dad comes over in the mornings and helps get her older children to school.  Tr. 51.  After getting the older children to school, the children's dad usually stays to be with the babies for the rest of the day until the older children are finished with school.  Tr. 52.  Beaver sometimes takes her family to visit with her mom.  Tr. 52.  Beaver is not involved in any social activities and she has no hobbies.  Tr. 52.  She does not read but will watch television or movies.  Tr. 52.

### 2.    Vocational expert's testimony

Vocational Expert Mark Anderson ("VE") testified at the hearing.  Tr. 55-58.  The ALJ asked the VE to consider an individual the same age as and with the same education as Beaver who would be able to lift and carry 10 pounds frequently; lift and carry 20 pounds occasionally; push and pull 10 pounds frequently; push and pull 20 pounds occasionally; sit, stand and walk 6

out of 8 hours in a workday; perform unskilled work (SVP 1 or SVP 2), meaning that jobs can be learned by short demonstration or in 30 days or less, requiring little judgment; jobs should not involve any arbitration, mediation, or negotiation; jobs should be low stress, meaning low production quotas; and jobs should involve minimal interaction with public, peers, and supervisors.  Tr. 55-56.

The ALJ explained that he did not consider Beaver's prior jobs to constitute past relevant work and then asked the VE whether there would be jobs available in the national economy for the described individual.  Tr. 56.  The VE listed three light, unskilled jobs that would be available; namely, inspector and hand packager; assembler of small products; and gluer.  Tr. 56-57.  The VE provided national job incidence data for the three identified jobs.  Tr. 56-57.

In response to a question posed by Beaver's counsel, the VE indicated that being off task 20% of the time due to psychiatric symptoms would preclude competitive employment.  Tr. 57-58.  The VE indicated that the upper limit for being off task was 15% of any hour or day.  Tr. 57-58.

## D.     Other evidence

On November 4, 2013, the Cleveland Cooperative Disability Investigations (CDI) Unit opened an investigation based on an allegation of fraud or similar fault identified by the Ohio Disability Determination Service (DDS).  Tr. 410-425.  It was reported that, during the initial development of Beaver's claim for social security benefits, "DDS discovered areas of conflict in the medical evidence of record in comparison to Beaver's statements regarding her alleged limitations."  Tr. 412 (alterations in original removed).  Both parties mention this investigation in their briefs in their statement of the facts.  Doc. 12, p. 3; Doc. 15, p. 3.  The ALJ considered this investigation along with other evidence of record.  Tr. 28-29, 30.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If the claimant is doing substantial gainful activity, he is not disabled.

2.  If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[7] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In his November 20, 2015, decision, the ALJ made the following findings:[8]

1.    Beaver meets the insured status requirements of the Social Security Act through June 30, 2011.  Tr. 25.

2.    Beaver has not engaged in substantial gainful activity since the alleged onset date of March 1, 2009.  Tr. 25.

3.    Beaver has the following severe impairments: bipolar disorder and obesity. Tr. 25.  All other impairments were non-severe impairments.  Tr. 25-26. Whether severe or non-severe, all medically determinable impairments were considered in assessing Beaver's RFC.  Tr. 26.

4.    Beaver does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments.  Tr. 26-27.

5.    Beaver has the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) except she can only perform unskilled work (SVP 1 or SVP 2),[9] defined as: no arbitration, mediation or negotiations; low stress (low

---

[7] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

[8] The ALJ's findings are summarized.

[9] SVP refers to the DOT's listing of a specific vocational preparation (SVP) time for each described occupation. Social Security Ruling No. 00-4p, 2000 SSR LEXIS 8, *7-8 (Social Sec. Admin.  December 4, 2000).   Using the skill level definitions in 20 CFR § 404.1568, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT.  *Id.*

production quotas); minimal interactions with the public, peers and supervisors.  Tr. 27-30.

6.      Beaver has no past relevant work.  Tr. 30.

7.      Beaver was born in 1986 and was 23 years old, defined as a younger individual age 18-49, on the alleged disability onset date.  Tr. 30.

8.      Beaver has a limited education and is able to communicate in English.  Tr. 30.

9.      Transferability of job skills is not material to the determination of disability.  Tr. 30-31.

10.     Considering Beaver's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Beaver can perform, including inspector and hand packager, assembler of small products, and gluer.  Tr. 31.

Based on the foregoing, the ALJ determined that Beaver had not been under a disability, as defined in the Social Security Act, from March 1, 2009, through the date of the decision.  Tr. 31.

## V. Parties' Arguments

First, Beaver argues that the ALJ committed reversible error by failing to fully and fairly consider the opinion and findings of her treating psychiatrist Dr. Kaza, failing to recognize that a report completed by Ms. Root was also completed by Dr. Kaza, and violating the treating physician rule.  Doc. 12, pp. 8-12.   Next, Beaver argues that, although the ALJ gave great weight to the opinion of consultative examining psychologist Dr. Haaga, the ALJ failed to fully consider and include all the limitations identified in Dr. Haaga's opinion.  Doc. 12, pp. 12-14.

In response, the Commissioner argues that the ALJ reasonably considered Dr. Kaza's observations and opinion as well as the opinion from Ms. Root and any failure to articulate is harmless error.  Doc. 15, pp. 8-13.   The Commissioner also argues that the ALJ reasonably evaluated the opinion from Dr. Haaga.  Doc. 15, pp. 13-14.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).   The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

**A.     The ALJ did not commit reversible error when evaluating Dr. Kaza's treatment and opinion**

Beaver contends that the ALJ erred with respect to his consideration of the opinion and findings of her treating psychiatrist Dr. Kaza.

Under the treating physician rule, "[t]reating source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544.  In deciding the weight to be given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion.  *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 404.1527(c).  An ALJ is not obliged to provide "an exhaustive factor-by-factor analysis" of the factors considered when weighing medical opinions.  *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011).

Additionally, in some circumstances, a violation of the treating physician rule might be "harmless error" (1) "if a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it[;]" (2) "if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion"; or (3) "where the Commissioner has met the goal of § 1527(d)(2)—the provision of the procedural safeguard of reasons—even though she has not

complied with the terms of the regulation." *Wilson*, 378 at 547.  In the last of these circumstances, the procedural protections at the heart of the rule may be met when the "supportability" or "consistency" of a doctor's opinion is *indirectly* attacked via an ALJ's analysis of that physician's other opinions, an analysis of the claimant's ailments, or an analysis of the record as a whole.  *Nelson v. Comm'r of Soc. Sec.,* 195 Fed. Appx. 462, 470-472 (6th Cir.2006).

In discussing the evidence, the ALJ stated the following with respect to Dr. Kaza:

> Later, the claimant entered treatment with CBH and received medication for her symptoms. On April 1, 2013, the claimant's treating psychiatrist, Dr. Koteswara Kaza, noted that he started treating the claimant in December 2012. He noted also that the claimant complained of hearing voices and of poor concentration. She did not do housework and her symptoms affected her ability to cook and clean. The claimant stayed at home and was no longer social (Exhibit 4F/3). In June 2013, the claimant denied depression and anxiety (Exhibit 5F/7). In January 2014, Dr. Kaza noted that she stayed compliant with treatment for Bipolar Disorder NOS (Exhibit 8F). However, she did not receive individual counseling and as of March 2014, Dr. Kaza did not order any medication due to her pregnancy (Exhibit l0F/3).

Tr. 28.  Beaver acknowledges that the ALJ recognized that Dr. Kaza was a treating psychiatrist and summarized certain evidence supplied by Dr. Kaza's.  However, Beaver takes issue with the ALJ's failure to attribute the April 23, 2015, Medical Source Statement to both Ms. Root and Dr. Kaza and the ALJ's failure to assign weight to the opinion.

Although the ALJ only stated that the April 23, 2015, statement was completed by Ms. Root, not Ms. Root and Dr. Kaza, and did not specifically assign weight to the opinions contained therein, Beaver has failed to show that the failure to do so was not harmless error.

In the April 23, 2015, statement, Ms. Root and Dr. Kaza opined that Beaver could constantly maintain regular attendance and be punctual within customary tolerances; deal with the public; deal with work stress; understand, remember and carry out complex job instructions; understand, remember and carry out detailed, but not complex, job instructions; and socialize.

Tr. 499-500.  They also opined that Beaver could frequently follow work rules; maintain attention and concentration for extended periods of 2 hour segments; respond appropriately to changes in routine settings; relate to coworkers; interact with supervisors; function independently without redirection; work in coordination with or proximity to others without being distracted; work in coordination with or proximity to others without being distracting; complete a normal workday and workweek without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; maintain appearance; behave in an emotionally stable manner; relate predictably in social situations; and leave home on her own.  Tr. 499-500.   And, they indicated that Beaver had the ability to occasionally understand, remember and carry out simple job instructions; and manage funds/schedules.  Tr. 500.  Beaver has not shown why, in light of these opinions, the ALJ should have included greater restrictions than those the ALJ included in the RFC.  Instead, Beaver contends that it was Ms. Root and Dr. Kaza who misread the form.  Doc. 12, p. 6, n. 1.  She suggests that by marking "constant," Ms. Root and Dr. Kaza meant that these were areas of constant restrictions.  Doc. 12, p. 10.  However, at the top of the form, the meaning of each available rating choice is clearly explained, specifically explaining that "constant" means that one's "ability to perform activity is unlimited."  Doc. 12, p. 10; Tr. 499.  If Ms. Root and Dr. Kaza misread the form, Beaver could have but did not submit a supplemental opinion from them explaining their misunderstanding.

Further, even if Ms. Root and Dr. Kaza misread the form and intended to opine that Beaver had areas of constant restriction, a more restrictive opinion was offered by Dr. Manudhane on October 26, 2015, (Tr. 501-502), yet the ALJ considered that opinion and the ALJ assigned no weight to it (Tr. 29).  In assigning no weight Dr. Manudhane's opinion that

Beaver could only "occasionally" to "rarely" perform work-related functions, the ALJ explained that the opinion was not consistent with the overall record.[10]  Tr. 29.  Thus, even if the April 23, 2015, opinion provided by Ms. Root and Dr. Kaza could reasonably be read to mean that Beaver had areas of constant restrictions or that she could rarely or only occasionally perform work-related activities, the ALJ addressed those restrictions when analyzing and weighing Dr. Manudhane's opinion and found them inconsistent with the overall record.  Accordingly, error, if any, in not assigning weight to Ms. Root and Dr. Kaza, is harmless since the ALJ, through his analysis of Dr. Manudhane's opinion, indirectly attacked the more restrictive limitations that Beaver contends the ALJ should have provided controlling weight to.

Also, in the April 23, 2015, statement, Ms. Root and Dr. Kaza indicated that Beaver's symptoms persisted notwithstanding "heavy medication doses[.]" Tr. 500.  The ALJ considered this statement but questioned it, stating that, while Beaver "received prescription medication . . . it is not clear that she takes the medication, given that there are no treatment records from any provider since June 24, 2010, when she birthed her twins[.]"  Tr. 29-30.

Additionally, Beaver has not shown that Dr. Kaza's opinion that Beaver's ability to tolerate stress (Tr. 396) was poor was not sufficiently accommodated in the RFC, which included a limitation of "low stress (low production quotas)" work.  Tr. 27.  Nor has she shown that Ms. Root and Dr. Kaza's observations that Beaver has difficulty being around others was not sufficiently accommodated in the RFC, which included a limitation of "minimal interactions with the public, peers and supervisors."  Tr. 27.

The ALJ also indirectly attacked Dr. Kaza's opinion by assigning great weight to the mental RFC opinion of Dr. Voyten, the state agency reviewing psychologist on reconsideration,

---

[10] In considering Dr. Manudhane's opinions, the ALJ also indicated that it was not clear that Dr. Manudhane had recently treated Beaver.  Tr. 29.

who opined that Beaver could complete simple, routine instructions/tasks and have superficial interactions in a static, low-stress environment.  Tr. 30, 94-96.

Based on the foregoing, although the ALJ did not explicitly indicate that the April 23, 2015, opinion signed by Ms. Root was also signed by Dr. Kaza, or assign specific weight to the opinion, the failure was harmless error.   Here, the ALJ's decision demonstrates that the ALJ indirectly attacked the more restrictive limitations that Beaver contends were espoused by Dr. Kaza, concluding that those more restrictive limitations were not consistent with the overall record.  *See Wilson*, 378 F.3d at 547 (Violation of treating physician rule may be "harmless error" "where the Commissioner has met the goal of § 1527(d)(2)-the provision of the procedural safeguard of reasons-even though she has not complied with the terms of the regulation."); *Nelson*, 195 Fed. Appx. at 472 (the court found that the ALJ's analysis of the claimant's impairments adequately addressed the opinions of the treating physicians by indirectly attacking the consistency of those opinions with other record evidence and the supportability of those opinions and implicitly provided sufficient reasons for not providing those opinions controlling weight).

For the reasons discussed herein, the undersigned recommends that the Court find that the ALJ's failure to strictly adhere to the treating physician rule is harmless error and therefore reversal is not warranted.

**A.      The Court should reject Beaver's argument that the ALJ erred in his consideration of the consultative examining psychologist's opinion**

Beaver argues that the ALJ erred with respect to his consideration of the opinion of consultative examining psychologist Dr. Haaga.

There is no dispute that the ALJ considered and weighed Dr. Haaga's consultative examining opinion.   The ALJ stated the following with respect to Dr. Haaga's opinion:

On April 24, 2014, the claimant attended a consultative psychological examination connected to her application for benefits. The claimant reported that she dropped out of school in the eleventh grade and had a history of learning difficulties. She stated that she had problems with focusing, attention and listening. The claimant reported that she was on several medications, including Risperdone, Trazadone and Benztropine. For her daily routine, the claimant rep01ied that she lies in her room while her children are at school. She lived with her father who performed the house chores. She did not have a bank account. She did not drive or have access to public transportation. She typically went to bed after taking her medication at 8:30pm.  On examination, the claimant was disheveled, with poor grooming and hygiene. She was cooperative, but maintained poor eye contact. She demonstrated adequate motivation.  Her mood was depressed with a flat affect. She reported hearing voices but did not appear to be responding to internal stimuli. She did not demonstrate anxiety, but reportedly did not like to be around people. She did some of the grocery shopping, however.  She endorsed experiencing hallucinations. She was well-oriented but her cognitive functioning was in the low average range. She had adequate judgment and common sense reasoning. She had fair insight into her current situation. The examiner concluded that the claimant could perform simple, routine tasks. Due to depression, she may have some difficulty with attention and concentration. The claimant was difficult to relate to and would have difficulty in social relations in a work environment (Exhibit 1lF). I afford great weight to the examiner's opinion, as it is consistent with the overall record and supported by the medical evidence of record; the claimant['s]depression puts limits on her ability to concentrate and in her social interactions.

Tr. 29.

Beaver argues that, although great weight was assigned to Dr. Haaga's opinion, Dr. Haaga's finding that Beaver "did not appear 'cognitively and psychologically capable of living independently and of making decisions about her future' [], was limited to simple tasks, had difficulty relating which would be problematic in a work setting, and lacked social support which may negatively influence her ability to withstand stress and pressure in a work setting [] does not translate to and actually exceeds the ALJ's finding that Ms. Beaver can perform unskilled, low stress work with minimal interactions with the public, peers, and supervisors []."  Doc. 12, p. 13.

The Regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all of the relevant evidence" of record.  20 C.F.R. §§ 404.1545(a)(3), 404.1546(c).   The ALJ, not a physician, is responsible for

assessing a claimant's RFC.  *See* 20 C.F.R. § 404.1546 (c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir.2009).  In assessing a claimant's RFC, an ALJ "is not required to recite the medical opinion of a physician verbatim in [her] residual functional capacity finding[ ] [and] an ALJ does not improperly assume the role of a medical expert by assessing the medical and nonmedical evidence before rendering a residual functional capacity finding." *Id.*  Thus, contrary to Beaver's suggestion, while the ALJ assigned great weight to Dr. Haaga's opinion, the ALJ was not required to incorporate all of Dr. Haaga's opinion into the RFC assessment.

Furthermore, Beaver has not shown that the mental RFC limitations do not adequately account for Dr. Haaga's opinion.  For example, Dr. Haaga opined that Beavers could perform simple, routine tasks.  Tr. 483.  The ALJ's RFC limits Beavers to unskilled work (SVP 1 or SVP 2).  Tr. 27.  Dr. Haaga opined that Beavers would have some difficulty with attention and concentration and her lack of social support could negatively impact her ability to withstand stress and pressure of work activities.  Tr. 484.  The ALJ's RFC limits Beavers to unskilled, low stress (low production quotas) work.  Tr. 27.  Dr.  Haaga opined that Beavers could have difficulty relating to others in a work setting.  Tr. 484.  The ALJ's RFC limits Beavers to minimal interactions with the public, peers and supervisors.  Tr. 27.  Additionally, the ALJ's mental RFC limitations are supported by the opinion of the state agency reviewing psychologist Dr. Voyten, whose opinion the ALJ also assigned great weight to.  Tr. 30, 94-96.

For the reasons discussed herein, Beavers has not demonstrated error with respect to the ALJ's consideration of Dr. Haaga's opinion or that the ALJ failed to properly account for limitations contained in Dr. Haaga's opinion when formulating Beaver's mental RFC.  Accordingly, the undersigned recommends that the Court find no error with respect to the ALJ's consideration of Dr. Haaga's opinion.

**VII. Recommendation**

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the

Commissioner's decision.

October 16, 2017

Kathleen B. Burke
United States Magistrate Judge

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of
Courts within fourteen (14) days after the party objecting has been served with a copy of this
Report and Recommendation.  Failure to file objections within the specified time may waive the
right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir.
1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).